## JONES & LAUGHLIN STEEL CO. v. MONONGAHELA & WESTERN DREDGING CO.

(Circuit Court of Appeals, Third Circuit. January 21, 1907.)

### No. 36.

CONTRACTS—CONSTRUCTION—WHEN QUESTION FOR JURY.

The construction of a written contract for dredging which was ambiguous in respect to the extent of the work to be done thereunder, rendering it necessary to resort to extrinsic evidence, was a question for the jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, §§ 767–770.]

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

For opinion below, see 144 Fed. 312.

George C. Wilson and Burleigh, Gray & Challener, for plaintiff in error.

Reed, Smith, Shaw & Beal, Charles Gulentz, and David A. Reed, for defendant in error.

Before DALLAS and GRAY, Circuit Judges, and LANNING, District Judge.

LANNING, District Judge. This case involves the construction of a contract entered into July 22, 1904, by the defendant in error, the plaintiff below, and the plaintiff in error, the defendant below. The defendant owns and operates coke ovens on the right bank of the Monongahela river, at or near Pittsburgh, Pa. Previous to 1902 it had deposited refuse materials on the bank of the river and out into the river to such an extent as to interfere with navigation. It had also erected some coke ovens on the bank thus made. On March 24, 1902, the defendant made application to the Secretary of War for a modification of the harbor line of the river according to a plan accompanying the application. The United States engineer at Pittsburgh, who had charge of the matter, suggested a line different from the one described in the defendant's plan, and the defendant by a letter dated July 3, 1902, agreed to the one so suggested, saying:

"If the line suggested by you is approved, we will agree within two years from the date of such approval to remove the material placed by us in the river at our lower block of coke ovens on the riverward side of the line you have suggested and above the specified slope. As this work will necessitate the removal of some of our coke ovens, we do not feel that we should undertake to do it in a shorter time on account of the difficulty in getting contractors to build the ovens to take the place of those that will be destroyed."

The suggested harbor line was approved by the Secretary of War on August 15, 1902. On April 20, 1904, the United States engineer wrote to the defendant, reminding it of its agreement of July 3, 1902, and saying:

"The time limit will expire August 15th next. This office is of the opinion that the time remaining to do this work is not more than sufficient within which the work can be done, and consequently the work should be promptly started."

Thereafter the defendant entered into negotiations with the plaintiff, which resulted in the following proposition from the plaintiff to the defendant:

"July 22, 1904.

"Jones & Laughlin Steel Company, Pittsburgh, Pa.—Dear Sirs: Referring to the matter of the dredging which you desire to have done near your coke ovens in the First Pool, Monongahela river, as shown to our Mr. Smoot by your Mr. Williams, we beg to make you the following proposition: We will dredge, take away and dispose of material dredged, for the sum of $1.25 per cubic yard, scow measurement. This includes blasting of bank where necessary and all labor and expense in connection with this work, which we understand is to be done in accordance with government specifications. We are ready to begin this work on the morning of the 28th instant. We agree to protect you and save you harmless from any damage to property or any claims from accident to or loss of life of any of our or your emplyees, caused by negligence on our part. Figuring on the number of yards as stated to our Mr. Smoot, we can complete this work within thirty (30) days after date of beginning. As to the matter of scow measurement, we would like to have your engineer in charge agree upon the measurement of the scows each day with the man in charge of the dredge or dredges placed on this work by our company.

"Yours very truly,      Monongahela & Western Dredging Company,
"W. T. Smoot, Vice President."

The defendant accepted this proposition and the plaintiff did its work under the contract thus made. The only specifications of the government then in existence were the specifications approved on August 15, 1902. On July 29, 1904, the day after the plaintiff had commenced its work, the defendant applied to the United States engineer for a modification of the slope of the bank along the harbor line, saying:

"We find that the adopted harbor line slope of 1 on 3 is unsuitable to our use of the harbor. The more nearly vertical this slope is the better it is for our use. All material from the river and to it is handled by machinery, and the nearer such machinery is to the water the better. We therefore respectfully request that a change in the harbor line slope be authorized as follows: The foot of the slope at pool full surface to remain the same as now established, viz., 42 ft.. from the harbor line. From point I to point II, as shown on map herewith, the slope to make an angle of 65 degrees with horizontal plane and extend to top of bank; above I and below II, this slope to gradually change into the present established slope in any reasonable manner you may think proper. This change of harbor line slope would change in no way the pool width of the Monongahela river. It would bring the top of the bank closer to the river and thereby facilitate our use of the stream, and would at the same time save to this company about 100 coke ovens worth about $1,000.00 apiece."

This application was forwarded to the chief of engineers, United States army, at Washington, on August 6, 1904, with the following recommendation by the United States engineer at Pittsburgh:

"I recommend that the Jones & Laughlin Steel Co. be authorized to substitute between points I and II, as shown on accompanying map, a bank slope

of 65 degrees for the slope of 1 on 3 as now established, with transition slopes above and below said place as described on the map."

The chief of engineers approved the recommendation on August 10th, and on August 22d the Secretary of War granted permission to the defendant "to substitute a bank slope of 65 degrees for the slope of 1 on 3 as now established, with transition slopes above and below, on the right bank of the Monongahela river about four miles above its mouth, Pittsburgh harbor, Pa., between the points marked I and II on map attached hereto." Point I was the beginning of the slope at the top of the bank, and point II was in the slope at the surface of the river at pool full.

The disputed point between the parties is whether, by the contract entered into by them, the plaintiff was to dredge the bank below point II; that is, below the surface of the water at pool full. The defendant has paid the plaintiff for all material removed above pool full, and this action resulted in a verdict and judgment for the plaintiff for the amount removed below pool full. It is clear that the revised government specifications of August 22, 1904, did not change the specifications of 1902 as to the bank below pool full, except in so far as transition slopes were thereby made necessary. It is also clear that the defendant was not released by the revised specifications from the duty of removing from the bank below pool full whatever was required to be removed by the specifications of 1902. But the defendant contends that the work to be done under the contract of July 22, 1904, was merely the removal of the material back to the proper slope of the bank at the harbor line and above pool full. This contention is based on the clause of the contract providing that the work should be done "as shown to our Mr. Smoot by your Mr. Williams." The plaintiff, on the other hand, contends that it agreed by its contract to do the work "in accordance with government specifications." These two clauses gave the contract an ambiguous meaning, to explain which oral testimony was properly admitted on the trial. The testimony shows that Mr. Smoot and Mr. Williams met on the ground on July 20th, two days before the date of the contract, to confer about the work. Mr. Williams then submitted to Mr. Smoot a blueprint of a plan for modifying the specifications which had been approved by the Secretary of War in 1902, by changing the location of the harbor line and changing the bank slope from the top of the bank down to the surface of the river at pool full. These proposed changes, though not submitted to any government official until July 29th, are the same that were approved August 22d. The blueprint submitted to Mr. Smoot on July 20th also showed, by shading, the part of the bank above pool full that was to be removed. No part below pool full was shaded, nor were there any lines on the blueprint indicating that any excavation below pool full was to be made. Mr. Williams says that in the conversation of July 20th he told Mr. Smoot that the defendant wanted the plaintiff to remove only the part that was indicated by the shading on the blueprint. But Mr. Williams admits that he put into the contract of July 22d the words "government specifications," although he says that he then understood that the blueprint "covered

what the government required." How he could have had that understanding when the proposed changes had not yet been submitted to any government official he does not explain. He also admits that he told Mr. Smoot on July 20th "that the government had insisted on our doing certain work, and that it was up to us to do it." Mr. Smoot says that Mr. Williams told him that the work "was to be done to the satisfaction of the government engineers," and that Mr. Gould, the government's inspector, would supervise it.

In the light of this testimony the jury evidently found that it was the intention of the parties by the contract of July 22d to provide for the removal of all the material required to be removed by the government specifications. Accordingly, they rendered a verdict in favor of the plaintiff for removing the material below the surface of the river at pool full. The disputed question was one of fact, and not of law. It could not have been properly withheld from the jury. We have carefully considered the 32 specifications of error, and find in them nothing to justify a reversal of the judgment.' They all relate, more or less directly, to the theory of the defendant that the contract can be construed only as one for the removal of material above pool full. As this theory is an erroneous one, none of the specifications can be sustained.

The judgment of the Circuit Court will be affirmed, with costs.